**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MOONSCOOP SAS, et al.,   ) | |
| ) | CASE NO. 1:09-CV-01885 |
| Plaintiffs/Cross-Claim   ) | |
| Defendants,   ) | |
| ) | JUDGE JAMES S. GWIN |
| vs.   ) | |
| ) | |
| AMERICAN GREETINGS   ) | |
| CORPORATION, et al.,   ) | |
| ) | |
| Defendants/Third-Party   ) | |
| Plaintiffs/Counterclaim   ) | |
| and Cross-Claim   ) | |
| Defendants,   ) | |
| ) | |
| vs.   ) | |
| ) | |
| COOKIE JAR ENTERTAINMENT,   ) | |
| INC.,   ) | |
| ) | |
| Third-Party Defendant/   ) | |
| Counterclaim/Cross-Claim   ) | |
| Plaintiff   ) | |

**REPLY BRIEF IN SUPPORT OF CROSS-CLAIM DEFENDANTS MOONSCOOP SAS
AND MIKE YOUNG PRODUCTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT
AGAINST CROSS-CLAIMANTS COOKIE JAR ENTERTAINMENT, INC. AND
COOKIE JAR ENTERTAINMENT (USA), INC.**

MoonScoop and MYP should be granted summary judgment as to Cookie Jar's Cross-Claims, including Count V (civil conspiracy), Count VI (tortious interference with contract), and Count VII (aiding and abetting fraud).  Cookie Jar has failed to produce any evidence showing that there are material disputes of fact as to these claims, and so MoonScoop and MYP are entitled to judgment as a matter of law.  Moreover, the claims should be dismissed as a procedural matter, as Cookie Jar is no longer a party to this case.

### A. COOKIE JAR'S CROSS-CLAIMS ARE MOOT BECAUSE COOKIE JAR IS NO LONGER A PARTY TO THIS CASE.

On January 13, 2010, MoonScoop and MYP moved for leave to file a Second Amended and Supplemental Complaint.  The Court granted leave to amend on February 4, 2010.

MoonScoop and MYP filed the Second Amended Complaint on February 5, 2010.  AG and TCFC filed their Answer to the Second Amended Complaint on February 19, 2010 but did not reassert their third-party claims against Cookie Jar.  Although AG had filed a third-party complaint against Cookie Jar in response to MoonScoop's original and First Amended Complaints, AG and TCFC did not file third-party claims in response to Plaintiffs' Second Amended Complaint.

An amended complaint supersedes all prior complaints.  *B&H Medical, LLC v. Stephen M. Ryan, PLLC*, 526 F.3d 257, 268 n.8 (6th Cir. 2008); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §1476 (2d ed. 1990).  "'When a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward' and 'wipes away prior pleadings.'" *Piher v. City of Grand Rapids*, 2009 U.S. Dist. LEXIS 54433 (W.D. Mich.) (quoting *Massey v. Helman*, 196 F. 3d 727, 735 (7th Cir. 1999)).  It is irrelevant that some or even all of the claims in the amended complaint simply repeat what was formerly pled.  *See, e.g., Carbon Processing and Reclamation, LLC v.*

*Valero Marketing and Supply Co.*, 2009 U.S. Dist. LEXIS 67177 (W.D. Tenn.) (motion to dismiss was moot even though the amended complaint alleged the exact same claims that were alleged in the original complaint, albeit with some additional facts).

A third-party complaint is a derivative pleading. As Rule 14 makes clear, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1). *See also, Trane U.S., Inc. v. Meehan,* 250 F.R.D. 319, 323 (N.D. Ohio 2008) ("third-party pleading is appropriate only where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the main claim; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded."); *Leach v. Bishop Bros. Auto Auction, Inc.*, 441 F. Supp. 98 (N.D. Ga. 1977) (liability of third-party defendant is dependent upon liability of the third-party plaintiff under Rule 14(a)); *Tower Mtg. Corp. v. Reynolds*, 81 F.R.D. 560 (W.D. Okla. 1978) (third-party claim may be asserted under Rule 14(a) only when third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to defendant). Therefore, because a third-party complaint is derivative of the complaint, it stands to reason that the third-party complaint is superseded when the complaint on which it is based is superseded.

Cookie Jar was a party to this case only because it was brought in as a third-party defendant by AG. Its liability and its status as a party were dependent upon the outcome of MoonScoop's claims against AG. When Plaintiffs filed their Second Amended Complaint, all prior pleadings were wiped away, including the third-party pleading. Accordingly, because AG and TCFC did not reassert a third-party complaint against Cookie Jar in response to the Second Amended Complaint, Cookie Jar is no longer a party to Case No. 09-01885, and its Cross-Claims against MoonScoop and MYP are therefore moot.

### B. COOKIE JAR'S CROSS-CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT FAILS AS A MATTER OF LAW.

Even if Cookie Jar were still a party to this case, its Cross-Claims would fail as a matter of law.

#### 1. Alleged Interference With The Letter Agreement.

Cookie Jar's Cross-Claim speculated that MoonScoop and MYP had interfered with the Letter Agreement by refusing to grant Cookie Jar an extension of time to close on its matching rights. MoonScoop and MYP disproved that speculation by setting forth undisputed facts showing that MoonScoop had not, in fact, refused to grant Cookie Jar's request. (Mem. in Support pp. 5-6, 8-9.) Rather, the decision rested entirely with AG. (Id.)[1]

Without any evidence to support its speculative theory, Cookie Jar now contends that MoonScoop and MYP tortiously interfered with the Letter Agreement by requiring AG to sign the March 2009 amendment to the 2008 Work-Made-For-Hire Agreement (that Agreement, as amended, is referred to herein as the "WFH Agreement"), thereby interfering with Cookie Jar's match rights under the Letter Agreement.[2] This new argument also fails.[3]

The argument is a red herring and does not even make sense. Cookie Jar's argument is that its match rights were breached because MoonScoop would receive more for its $95 million purchase than what Cookie Jar would receive if it matched the $95 million offer. That is untrue. If Cookie Jar had closed on its match, it would have received total ownership and control of the

---

[1] The claim also fails because MoonScoop and MYP's failure to act cannot be deemed interference. The claim requires a showing of intentional interference. Interference cannot be based on inaction, particularly where the alleged interferer has no obligation or duty to act.

[2] As a threshold matter, this new theory fails to implicate MoonScoop, as it was not a party to the WFH Agreement.

[3] Cookie Jar refers to the WFH Agreement as the "Production Agreement" in the hopes that its nomenclature will blind the Court to the actual terms of the document. For purposes of this argument, however, it is irrelevant what the document is called.

Properties. With ownership, it would also control the production rights.[4] Thus, it would have been meaningless for AG to offer a production agreement to Cookie Jar as a part of Cookie Jar's decision to match the MoonScoop offer. Cookie Jar would already have those rights upon purchase. There would be no need to offer a separate production agreement because such an agreement would have merged with Cookie Jar's ownership rights and would have effectively ceased to exist as a separate right.

Similarly, when MoonScoop closes, it will own the Properties and the WFH Agreement will essentially become meaningless to both AG and Cookie Jar, as MoonScoop would then be self-funding the WFH Agreement with MYP and the break-up fees would be moot. Indeed, the WFH Agreement has value only if neither MoonScoop nor Cookie Jar closes on the purchase of the Properties. Under that scenario, AG will remain the owner of the Properties, and MYP will be able to earn money under the WFH Agreement. But under that scenario AG has no obligation to offer a production agreement to Cookie Jar – its obligation is merely to allow Cookie Jar to match a purchase of the Properties. AG met that obligation, as it offered the same value for purchase of the Properties to Cookie Jar as it offered to MoonScoop. The WFH Agreement has no bearing whatsoever on the value of that purchase.

The argument that AG was required to offer Cookie Jar a break-up fee is also wrong. Cookie Jar's matching right is to match what MoonScoop's deal is to purchase the Properties. If MoonScoop purchases, then neither MoonScoop nor MYP is due a break-up fee. Thus, the break-up fees are not validly part of Cookie Jar's consideration whether to match. They only

---

[4] As the WFH Agreement makes clear, it is terminable upon the sale of the Properties, whether to Cookie Jar or anyone else. (WFH Agreement ¶4(a)(i).) So even if the WFH Agreement could somehow be construed as a production agreement, it in no way would have prevented Cookie Jar from acquiring the production rights following its purchase of the Properties.

apply if the Properties are not purchased, and Cookie Jar had matching rights only to purchase; it did not have matching rights if it decided not to purchase.

Moreover, even aside from the absurdity of the arguments, Cookie Jar has not shown that MoonScoop and MYP had procured the alleged breach of contract. Cookie Jar simply asserts the conclusion that by insisting on the "Production Agreement," MoonScoop induced AG to subvert Cookie Jar's matching rights. Civil Rule 56(e)(2), however, requires something more than an unsupported conclusion. Cookie Jar nowhere explains or presents any evidence supporting how the WFH Agreement subverted its rights. Cookie Jar had to produce specific evidence showing that MoonScoop intended to cause a breach of contract. Simply entering into a conflicting contract is not enough. *See, e.g., Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 128 (6th Cir. 1992) (entering into a contract knowing that another's contract could not be performed concurrently does not, in and of itself, constitute impermissible interference). There is no evidence that MoonScoop and MYP intentionally sought the breach of Cookie Jar's matching rights.

Similarly, Cookie Jar did not meet its burden of producing any facts regarding its alleged damages. Cookie Jar simply states that its damages stemming from MoonScoop's alleged tortious interference with its matching rights was the lost opportunity to purchase the Properties. Not only does Cookie Jar's conclusory statement fail to meet Rule 56(e)(2)'s evidentiary standard, it also makes an unwarranted leap of logic. As demonstrated above, the deal presented to Cookie Jar was of the same value as that offered to MoonScoop, regardless of the red herring "Production Agreement." As such, the Court is left to wonder how the so-called Production Agreement "subverted" in any way Cookie Jar's opportunity to purchase the Properties. Clearly, it did not.

## 2. Alleged Interference With The License Agreement.

Cookie Jar's claim against MoonScoop and MYP for tortious interference with ¶18 of the License Agreement also fails.  Cookie Jar contends that MoonScoop and MYP interfered with, and caused a breach of, ¶18 of the License Agreement by virtue of having entered into the WFH Agreement.  MoonScoop and MYP's Motion for Summary Judgment showed that the License Agreement was not breached; that there is no evidence that MoonScoop or MYP intentionally interfered or procured a breach; and that, in any event, MoonScoop and MYP's conduct was privileged.

Cookie Jar argues that ¶18 was breached because the WFH Agreement is, in actuality, a production agreement.  This issue has already been extensively briefed by both MoonScoop/MYP and AG/TCFC.  Cookie Jar, however, takes issue with the concept that the "producer" is the person or entity who controls the costs and bears the financial responsibility for production.

Cookie Jar concedes that the WFH Agreement expressly states that AG is the producer and that MYP is being engaged to perform certain animation services, including pre-production and post-production services.  However, Cookie Jar argues that such services effectively make MYP the producer, as such services fall within the common definition of the words "produce" and "producer."  Cookie Jar cites to Merriam Webster's Collegiate Dictionary, which defines "produce" as "to make available for public exhibition or dissemination: as (a): to provide funding for … or (b): to oversee the making of."  (Cookie Jar Br. in Opp. p. 20.)  The definition of "producer" is "a person who *supervises* or finances a work (as a staged or recorded performance) for exhibition or dissemination to the public."  (Id., emphasis added by Cookie Jar).

It is difficult to see how these definitions help Cookie Jar's case.  Rather, they strongly support the position of MoonScoop, MYP, AG and TCFC.  As Cookie Jar's definitions confirm,

-7-

to produce or to act as a producer means to put up the financial investment. Cookie Jar ignores that half of the equation, focusing instead on the concept that the producer is one who "supervises." But that concept is also of no avail to Cookie Jar, as AG specifically reserved for itself the supervisory services in the WFH Agreement.

For example, the March 2009 Amendment (referred to by Cookie Jar as the "Production Agreement") expressly provides that AG's role is as follows:

> For the avoidance of doubt, <u>AG is the producer</u> of any audiovisual programs referenced in this Amendment and/or the Agreement. Accordingly, <u>AG shall provide all of customary and usual producing services</u> including but not limited to the provision of: financing, scripts, casting, recording costs, casting fees and expenses, music, voice direction, hiring of overseas animation studios, executive producer functions, supervising director functions, script clearance and the provision of certain customary insurance.

(March 2009 Amendment p. 1 (emphasis added).) MYP, on the other hand, was engaged to provide animation services. Yet, even with respect to those services, AG retained the right to determine the production schedule formats and techniques for those services (¶1(c)), and MYP's services were subject to AG's approval. (¶1(f).) In other words, AG not only finances the production, it has reserved for itself the functions of a producer, as well as the power to supervise the projects. According to Cookie Jar's own definition, AG is the producer. As such, the WFH Agreement was not a "production agreement" in violation of ¶18 of the License Agreement.

Nor has Cookie Jar produced evidence that MoonScoop and MYP intentionally procured a breach of ¶18. The extent of Cookie Jar's argument is that MYP entered into a conflicting contract and that the parties agreed to keep the deal a secret. The first aspect of that argument fails as a matter of law, and the second aspect fails for want of any evidentiary support.

Ohio law does not deem it impermissible interference when a party enters into a contract knowing that another's contract cannot be performed concurrently with the new contract. *See,*

*Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 128 (6th Cir. 1992). And Cookie Jar's trumped up charge that the parties conspired to keep the WFH Agreement a secret is easily exposed. The basis for Cookie Jar's assertion is a March 25, 2009 email chain between Josef Mandelbaum (of AG) and Bill Schultz (of MYP) in which they agree that neither should issue a press release about the recently signed amendment to the WFH Agreement. (Ex. 12 to Zbiegien Declaration.) Nowhere, however, does either party state that the amendment is to be kept a secret from Cookie Jar. For good reason, too, because Mandelbaum had already informed Cookie Jar of the amendment. Attached as Ex. 19 to the Zbiegien Declaration is a March 24, 2009 email – sent the day before the purported "secret agreement" – in which Gilhooly (of Cookie Jar) discusses the new amendment with Mandelbaum. If Cookie Jar already knows about the amendment on March 24 and is already posturing it as a violation of the License Agreement, what purpose would it serve for AG and MYP to agree on March 25 to keep it a secret from Cookie Jar? Obviously, that is not what they were doing.

  Finally, even if the subject matter of the two contracts was the same, and even if Cookie Jar had produced evidence that MoonScoop and MYP had intentionally procured a breach of ¶18, Cookie Jar cannot overcome the fair-competition privilege. Cookie Jar argues that the fair competition privilege is inapplicable because Ohio law recognizes that privilege only where the breached contract was terminable at will. *See, e.g., GZK, Inv. v. Schumaker Ltd. P'ship*, 2008 Ohio 1980 (2nd App. Dist.). In the context of ¶18, however, the License Agreement was effectively terminable at will.

  Cookie Jar's argument is that ¶18 of the License Agreement gave it first negotiation/last refusal rights with respect to production. Essentially, that is a match right – Cookie Jar has the right to match any third party's deal for production services. However, AG retained the right to

-9-

be its own producer. If AG took the production in-house, then Cookie Jar had no rights at all. In essence, Cookie Jar's ¶18 rights were terminable at AG's discretion.

The "last refusal" concept also renders ¶18 an at-will contractual right. ¶18 does not require Cookie Jar to provide production services; nor does it provide that Cookie Jar always has the right to provide production services. Rather, it grants Cookie Jar the right to match any deal that AG enters into with a third party. Thus, each of the parties has the right to cancel ¶18 without cause: AG by taking production services in-house, and Cookie Jar by simply not exercising its last refusal rights.

Therefore, there was nothing improper about MYP entering into the WFH Agreement. It was done to further its own economic interest and not in a malicious attempt to destroy Cookie Jar's rights. Indeed, ¶18 of the License Agreement specifically contemplated that AG could engage third-parties under certain circumstances. *See, Franklin Tractor Sales v. New Holland North America, Inc.*, 2004 U.S. App. LEXIS 16333 (6th Cir. 2004) (dealer's tortious interference with contract claim was negated because the manufacturer's contract permitted direct dealing with customers). Because those rights could be terminated by either AG or Cookie Jar without cause, MYP's fair competition constitutes privileged conduct, and Cookie Jar's tortious interference claim fails.

C. **COOKIE JAR'S AIDING AND ABETTING FRAUD CLAIM FAILS AS A MATTER OF LAW.**

The Sixth Circuit has indicated that it is "unclear" whether Ohio recognizes a claim for aiding and abetting fraud. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 570 (6th Cir. 2006) (retreating from its forecast in *Aetna Casualty & Surety Co. v. Leahey Constr. Co.*, 219 F.3d 519, 533 (6th Cir. 2000) that the Ohio Supreme Court would recognize such a claim). Despite the Sixth Circuit's equivocal statement, Cookie Jar unequivocally asserts that such a claim is

recognized under Ohio law. Cookie Jar's position, however, is based on outdated case law and a decision from an Ohio common pleas court. MoonScoop respectfully submits that the trend of decisions from the Ohio courts of appeal is that such a claim is not cognizable under Ohio law.

Two recent decisions from the Ohio courts of appeal have unequivocally held that such a claim does not exist under Ohio law. *See, Collins v. Nat'l City Bank*, 2003 Ohio 6893 ¶32 (2nd App. Dist. 2003) ("The [trial] court correctly held that aiding and abetting common law fraud is not cognizable in law."); *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 381 (10th App. Dist. 2000) (affirming trial court's holding that Ohio does not recognize a claim for aiding and abetting common law fraud).

The only Ohio appellate decision that Cookie Jar relies on is *Harris v. Ambrozic*, 2004 Ohio 619 (5th App. Dist. 2004). *Harris*, however, was founded not on any precedent from the Ohio courts, but solely on the Sixth Circuit's prognostication in *Aetna*. *See, Harris*, 2004 Ohio 619 ¶32. In *Pavlovich*, however, the Sixth Circuit expressed second thoughts about *Aetna*, thereby gutting its precedential value and, in turn, *Harris*' precedential value, too.

Moreover, even if there were a cognizable claim under Ohio law, Cookie Jar cannot sustain it under the facts of this case. MoonScoop showed that there was no evidence of an underlying fraud or of MoonScoop's knowledge and participation in a fraud. In response, Cookie Jar had the obligation under Civil Rule 53(e)(2) to set forth specific facts showing MoonScoop's knowledge and participation. Cookie Jar failed to meet its obligation, as it relied solely on testimony from Joel Vaturi to show MoonScoop's alleged knowledge of AG's fraudulent plan. That testimony, however, shows no such thing. Rather than showing knowledge of a fraud, Mr. Vaturi's testimony – as quoted by Cookie Jar – shows only that Mr. Vaturi was told that AG intended to make Cookie Jar abide by the terms of Letter Agreement:

> Word for word I can't say, but what I remember is very macho and basically, you know, saying that they would hammer them until need be and until the contract would be honored.
>
> ***
>
> What I heard was, again, in Cathy's words as well as voiced by Mr. Weiss himself at the May 27th meeting, that they [American Greetings] would do whatever it took in a very aggressive way to force Cookie Jar to comply by what they believed were they (sic) commitments toward AG.

(Cookie Jar Mem. in Opp. At 33-34, quoting Vaturi Dep. at 53-54, 143.) The evidence relied on by Cookie Jar actually undercuts its claim. Mr. Vaturi did not have knowledge of AG's intent to perpetrate a fraud; he knew only that AG intended to enforce its contractual rights.

Indeed, the testimony alludes to the larger issue that there was, in fact, no fraud perpetrated on Cookie Jar. Cookie Jar contends that MoonScoop participated in a fraud by entering into the Term Sheet and so-called Production Agreement with AG. Yet, that is precisely the same predicate for its tortious interference with contract claim. As such, Cookie Jar contends that the same conduct constitutes both a breach of contract and a fraud. Cookie Jar cannot have it both ways. *See, Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137 (9th App. Dist. 1996) (actions constituting a breach of contract cannot also render one liable for fraud). There was no fraud, and MoonScoop certainly did not aid and abet a fraud.

### D. COOKIE JAR'S CIVIL CONSPIRACY CLAIM FAILS AS A MATTER OF LAW.

Moonscoop and MYP identified three deficiencies in Cookie Jar's civil conspiracy claim: (1) the lack of an unlawful act independent of the alleged conspiracy; (2) the lack of malicious intent on the part of MoonScoop and MYP; and (3) the lack of any damages sustained by Cookie Jar as a result of the alleged conspiratorial acts. (Mem. in Support pp. 11-13.) In response, it was incumbent upon Cookie Jar to produce specific facts as to each of the three categories

showing there is a genuine dispute for trial. *See*, Fed. R. Civ. P. 56(e)(2). Cookie Jar failed to meet its burden.

Rather, Cookie Jar simply asserts in conclusory fashion that "there are at least questions of fact regarding whether [AG and MoonScoop] engaged in a civil conspiracy." (Cookie Jar. Opp. p. 34.) Nowhere, however, does Cookie Jar identify what those disputed facts might be. Cookie Jar did not produce any facts regarding MoonScoop's and MYP's alleged malicious intent; and Cookie Jar did not even attempt to explain (let alone produce specific facts) how it has suffered damages as a result of the alleged conspiracy. Accordingly, Cookie Jar's civil conspiracy claim must also be dismissed.

## CONCLUSION

For the reasons set forth herein and in the other briefs filed by MoonScoop and MYP, Cross-Claim Defendants MoonScoop SAS and Mike Young Productions, LLC respectfully request that the Court dismiss with prejudice Counts V, VI, and VII of the Cross-Claim filed by Cookie Jar Entertainment, Inc. and Cookie Jar Entertainment (USA), Inc.

Respectfully submitted,

/s/ Harold E. Farling
Harold E. Farling (0055891)
Thomas G. Kovach (0047213)
KOVACH & FARLING CO., LPA
925 Leader Building
526 Superior Avenue East
Cleveland, Ohio 44114-1401
(216) 357-3301
(216) 357-3301 (fax)
hfarling@kflpa.com
tkovach@kflpa.com

and

        Michael J. Garvin (0025394)
        mjgarvin@hahnlaw.com
        Eric B. Levasseur (0075353)
        eblevasseur@hahnlaw.com
        Jeffrey A. Yeager (0068062)
        jyeager@hahnlaw.com
        HAHN LOESER & PARKS LLP
        200 Public Square, Suite 2800
        Cleveland, Ohio 44114-2316
        Telephone:  216-621-0150
        Facsimile:  216-241-2824

        Attorneys for Cross-Claim Defendants
        MoonScoop SAS and Mike Young
        Productions, LLC

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing Reply Brief complies with the page limitations set forth in Local Rule 7.1 for a standard track case.

        /s/ Harold E. Farling
        Harold E. Farling (0055891)

## **CERTIFICATE OF SERVICE**

A copy of the foregoing is being filed this 8th day of March, 2010 and is being served upon counsel of record by operation of the Court's electronic filing system.

        /s/ Harold E. Farling
        One of the Attorneys for Cross-Claim
        Defendants MoonScoop SAS and
        Mike Young Productions, LLC